IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 3, 2024

IN RE ETHAN W.

Appeal from the Circuit Court for Meigs County
No. 2022-CV-13            Michael S. Pemberton, Judge

_____

No. E2024-00318-COA-R3-PT
_____

In this case involving termination of a mother's and father's parental rights to their minor child, the trial court found that three statutory grounds for termination of the mother's parental rights and two statutory grounds for termination of the father's parental rights had been proven by clear and convincing evidence. The trial court further found, by clear and convincing evidence, that termination of both parents' parental rights was in the child's best interest. Both the mother and father have appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY ARMSTRONG, JJ., joined.

Allison M. Rehn, Harriman, Tennessee, for the appellant, Jaclyn W.

Chelsie L. Spurling, Wartburg, Tennessee, for the appellant, Jeremy W.

Jonathan Skrmetti, Attorney General and Reporter, and Amber L. Barker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural History

This is an appeal from an order of the Meigs County Circuit Court ("trial court") terminating the parental rights of Jaclyn W. ("Mother") and Jeremy W. ("Father") to their child, Ethan W. ("the Child"). In July 2016, a few months after the Child was born, the

Meigs County Juvenile Court ("juvenile court") awarded custody of the Child to Father upon Father's allegations that Mother was neglecting to care for the Child and had been exposing him to the manufacture and purchase of methamphetamines. In the July 12, 2016 order awarding custody to Father, the juvenile court noted that Mother had "said she will sign over [the C]hild." The parents were later divorced in 2018, and the Child remained in Father's custody until Father was arrested and incarcerated in June 2020 on domestic violence charges. At that time, the juvenile court placed the Child into protective custody with the Tennessee Department of Children's Services ("DCS"). The juvenile court concomitantly appointed counsel for Father and a guardian *ad litem* for the Child. DCS created a permanency plan in July 2020, which was later ratified by the trial court in April 2021. The permanency plan was revised in August 2022 and again in February 2023.

In September 2020, the juvenile court determined that Mother would not be allowed contact with the Child until she had "completed and passed a hair follicle drug screen." Mother did not supply the required drug screen results to the court. The Child was adjudicated dependent and neglected in December 2020. In the December 29, 2020 order resulting from the adjudicatory hearing, the court noted that Father had "waived the adjudicatory hearing" and had stipulated that "although the issue that caused removal [of the Child from Father's custody] has been resolved," Father needed "time to establish stability." In the same order, the juvenile court instructed that Mother would continue to have no contact with the Child until she completed a "nail bed drug test that is clean for all illegal/non-prescribed substances." The Child remained in protective custody thereafter.

In September 2021, Father pled guilty to criminal assault, stemming from an incident that had occurred the previous March. In October 2021, Father was arrested and incarcerated for violation of the terms of his probation relative to the assault charge because he failed to submit to a drug test. Father was released from jail for time served in January 2022. On January 24, 2023, Father pled guilty to joyriding and was sentenced to ten months, twenty-two days of unsupervised probation after having served a little over a month in jail on the original theft of property indictment.

On March 17, 2022, DCS filed a petition to terminate Mother's and Father's parental rights to the Child ("the Termination Petition"). DCS alleged that clear and convincing evidence supported the following grounds for termination: (1) substantial noncompliance with the permanency plans (against both parents), (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child (against both parents), (3) abandonment by failure to visit the Child during the relevant four-month period (against Mother), and (4) persistence of the conditions that led to the Child's removal from custody (against Father). DCS further alleged that termination of both Mother's and Father's parental rights was in the Child's best interest.

The trial court conducted a bench trial on August 18 and September 7, 2023, during which the court heard testimony from Father; DCS case worker Christina Martin; the

2

Child's foster mother, T.S. ("Foster Mother"); and Father's girlfriend, G.K. Mother failed to appear for trial and was not represented by counsel.[1] On January 31, 2024, the trial court entered an order terminating Mother's and Father's parental rights to the Child. The trial court determined that clear and convincing evidence supported the following grounds for termination of Mother's parental rights: (1) substantial noncompliance with the requirements of the permanency plans, (2) failure to manifest a willingness or ability to assume physical custody of or financial responsibility for the Child, and (3) abandonment by failing to visit the Child. The trial court determined that clear and convincing evidence supported two of the three grounds raised by DCS for termination of Father's parental rights: (1) substantial noncompliance with the requirements of the permanency plans and (2) persistence of the conditions that led to removal of the Child into protective custody. The trial court also determined that termination of parental rights as to both parents was in the Child's best interest. Mother and Father have appealed.

## II. Issues Presented

Mother presents the following issues for our review, which we have restated slightly:

1. Whether the trial court erred by determining that Mother had abandoned the Child by failing to visit the Child during the relevant four-month period.

2. Whether the trial court erred by determining that termination of Mother's parental rights was in the Child's best interest.

Father presents the following additional issues, which we have also restated slightly:

3. Whether the trial court erred by determining that statutory grounds existed for the termination of Father's parental rights to the Child.

4. Whether the trial court erred by determining that termination of Father's parental rights was in the Child's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a

---

[1] The trial court explained at the beginning of the trial that it had declined to appoint counsel for Mother because Mother had failed to prove that she was indigent.

3

presumption of correctness unless the evidence preponderates against those findings.  *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530.  Questions of law, however, are reviewed *de novo* with no presumption of correctness.  *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions."  *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002).  It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute."  *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).  As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)].  Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child."  Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable").  In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings.  *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence.  *Santosky*, 455 U.S. at 769.  This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights.  *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).  "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings."  *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted).  The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not.  *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

4

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

We note that DCS has not presented any issue on appeal regarding the trial court's determination that, as pertaining to Father, DCS failed to prove by clear and convincing evidence the statutory ground of failure to manifest an ability or willingness to assume custody of or financial responsibility for the Child pursuant to Tennessee Code Annotated § 36-1-114(g)(14). Although our Supreme Court has instructed that this Court "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal," *see In re Carrington H.*, 483 S.W.3d at 525-26, this Court has not interpreted this instruction "to mean that this Court must also review grounds that the trial court found were not sufficiently proven when the party who sought termination does not challenge that ruling on appeal." *In Re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at \*5 (Tenn. Ct. App. Mar. 8, 2023) (quoting *In re C.S.*, No. E2019-01657-COA-R3-PT, 2020 WL 2066247, at \*3 (Tenn. Ct. App. Apr. 29, 2020)). Accordingly, we will not review the trial court's determination that the statutory ground of failure to manifest an ability or willingness to assume custody of or financial responsibility for the Child, as pertaining to Father, had not been proven by clear and convincing evidence.

IV. Statutory Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2021, to current)[2] lists the statutory requirements for termination of parental rights, providing in relevant part:

---

[2] Unless otherwise noted, throughout this Opinion all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the Termination Petition was filed and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at \*4 n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, the sub-section that was in effect at that time has not changed and therefore remains current.

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

## A. Statutory Grounds for Termination of Mother's Parental Rights

The trial court determined that clear and convincing evidence supported the following grounds for termination of Mother's parental rights: (1) abandonment by failing to visit the Child; (2) failure to substantially comply with the requirements of the permanency plans; and (3) failure to manifest a willingness or ability to assume physical custody of or financial responsibility for the Child.

### 1. Abandonment by Failure to Visit

Concerning the ground of statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (West July 1, 2021, to current) provides as relevant to this action:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

The version of Tennessee Code Annotated § 36-1-102(1)(A) (West July 1, 2021, to May 8, 2022) in effect when the Termination Petition was filed provided the following definition of abandonment as pertinent here:

For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

> (i)     For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Our review of the record demonstrates that the relevant four-month statutory period for determining whether abandonment occurred in this case is November 17, 2021, to March 16, 2022 ("Determinative Period"). *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing). Concerning the Determinative Period, the trial court found that Mother had abandoned the Child because she failed to visit the Child "within the four (4) month period prior to the filing of the [Termination] Petition on March 17, 2022." Although the court did not specifically identify the dates of the Determinative Period, we determine such error to be harmless because the court "made sufficient findings of fact that encompassed the correct determinative period." *See In re Elijah F.*, No. M2022-00191-COA-R3-PT, 2022 WL 16859543, at *5 (Tenn. Ct. App. Nov. 10, 2022).

Pertaining to this ground, the trial court determined:

> [T]he mother did not visit the child within the four (4) month period prior to the filing of the Petition on March 17, 2022. As noted above, the mother did not show up for the trial. She also failed to submit to the drug screen/test ordered by the [juvenile court] on June 24, 2021. The passing of the drug screen/test was a requirement for her to be able to visit with her child. [DCS] made multiple attempts to have the mother complete the drug screen/test to no avail. She elected not to take the screen/test and, as a result, she has not had any visitation with her child since at least before June 2020.

(Citations to the record omitted.)

In her appellate brief, Mother admits that she did not visit the child "at all" during the Determinative Period. However, she argues that her failure to visit was not willful because she was "legally prevented" from visiting the Child by the juvenile court's orders, "which were reiterated several times." Mother avers that these orders prohibited her from visiting with the Child unless she submitted to a hair follicle drug test.

Concerning the defense of lack of willfulness, Tennessee Code Annotated § 36-1-102(1)(I) provides:

> It shall be a defense to abandonment . . . that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

As this Court has explained regarding the procedural requirements for raising the willfulness defense:

> Absence of willfulness must be raised as an affirmative defense pursuant to Tenn. R. Civ. P. 8.03. Tenn. Code Ann. § 36-1-102(1)(I). Rule 8.03 provides that in raising an affirmative defense in a responsive pleading, "a party shall set forth affirmatory facts in short and plain terms relied upon to constitute" the defense. Tenn. R. Civ. P. 8.03.

*In re Brylan S.*, No. W2021-01446-COA-R3-PT, 2022 WL 16646596, at *6 (Tenn. Ct. App. Nov. 3, 2022). "As a general rule, a party waives an affirmative defense if it does not include the defense in an answer or responsive pleading." *Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 735 (Tenn. 2013) (citing Tenn. R. Civ. P. 12.08). Mother did not raise lack of willfulness as an affirmative defense at any time in the trial court. Accordingly, she has waived this issue. *See, e.g.*, *In re Imerald W.*, No. W2019-00490-COA-R3-PT, 2020 WL 504991, at *4 n.5 (Tenn. Ct. App. Jan. 31, 2020) (quoting *Pratcher*, 407 S.W.3d at 735 and stating that a parent waives the affirmative defense of lack of willfulness when the parent fails to raise the defense at trial).

Even assuming, *arguendo*, that Mother had preserved the issue of willfulness, the proof presented at trial supports the trial court's conclusion that Mother had abandoned the Child by failing to visit. Mother contends she was "legally prevented" from visiting with the Child by the court orders denying her visitation unless she submitted to a drug test. However, the proof demonstrated that Mother was never prevented from submitting to the required drug tests. On the contrary, Ms. Martin testified that she repeatedly reminded Mother of the requirement, informed Mother of available drug test locations, and offered Mother encouragement and transportation assistance to complete the required drug screen.

8

In addition, case worker Christina Walsh reported that she had secured an order for a drug screen for Mother in June 2020 and offered to provide transportation to Knoxville for Mother to take the test, but that Mother did not take advantage of this opportunity.

"This Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit." *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845, at *6 (Tenn. Ct. App. June 30, 2014) (citing *In re Elijah B.*, E2010-00387-COA-R3-PT, 2010 WL 5549229, at *8 (Tenn. Ct. App. Dec. 29, 2010)). This includes a parent's failure to take a drug screen when the parent's visitation with a child has been suspended due to drug use. *See, e.g.*, *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015) (rejecting the mother's argument that her failure to visit was not willful when the trial court had suspended her visitation, and the suspension was "the direct result of her failure to produce negative drug screens."); *see also In re Morgan S.*, No. E2009-00318-COA-R3-PT, 2010 WL 520972, at *9 (Tenn. Ct. App. Feb. 12, 2020) (A "parent's choice to continue to use drugs when the parent is prohibited from visiting a child until passage of a drug test constitutes a willful failure to visit the child."). Accordingly, we determine that even had Mother not waived the willfulness defense, clear and convincing evidence supports the trial court's finding that Mother abandoned the Child by failing to visit during the Determinative Period.

## 2. Substantial Noncompliance with Permanency Plans

Tennessee Code Annotated § 36-1-113(g)(2) provides an additional ground for termination of parental rights:

> There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]

The Tennessee Supreme Court has described the requirements for finding this ground as follows:

> Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed.1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

9

> Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant.

*In re Valentine*, 79 S.W.3d 539, 549 (Tenn. 2002); *In re Carrington H.*, 483 S.W.3d at 537 ("A parent's rights may be terminated for her substantial noncompliance with the responsibilities contained in a permanency plan . . . so long as the plan requirements are reasonable and related to remedying the conditions which necessitate[d] foster care placement.") (citations and internal quotation marks omitted).

In the instant case, DCS created an initial permanency plan outlining requirements for both parents on July 6, 2020, and the plan was revised in August 2022 and February 2023. Upon review of the requirements set forth in the permanency plans, we determine that they were reasonably related to the goal of reunification for each parent. *See In re Carrington H.*, 483 S.W.3d at 537. The plans required each parent to work toward building a secure, stable home environment for the Child, to address their drug addiction and legal problems, to remain in contact with DCS, and to continue building a positive bond with the Child. In our view, all of these are reasonable and related to the goal of reunification between the parents and the Child.

In the order terminating parental rights, the trial court found by clear and convincing evidence that neither parent had substantially complied with the requirements of the permanency plans. Regarding Mother, the permanency plans required her to, *inter alia*, complete the following: (1) refrain from associating with any known drug user or dealer; (2) remain sober, submit to random drug screens, and pass a hair follicle drug test prior to any visitation with the Child;[3] (3) complete an alcohol and drug assessment; (4) complete an approved domestic violence program; (5) obtain and maintain employment with proof of income; (6) consent to a walk-through of her home and allow home visits; (7) obtain and maintain suitable housing and provide a copy of a lease; (8) abide by all court orders, including the permanency plan; (9) remain in contact with DCS and notify the social worker of any change in circumstances such as phone number, address, employment, and composition of the home; and (10) consistently participate in visitation with the Child, comply with visitation rules, and interact in a manner that would promote a healthy relationship with the Child. After delineating these requirements in its final order, the trial court determined that Mother had provided no proof that she had complied with any of them. The trial court then concluded that Mother had not complied with the permanency plans "in any regard."

Upon careful review, we agree with the trial court's determination that Mother failed to substantially comply with the requirements of the permanency plans. Indeed, as the trial court noted, there is no proof that Mother complied with any of the above-listed

---

[3] As of February 17, 2023, the permanency plan was updated to require mother to complete a "nail bed drug screen" due to her "history of drug use."

requirements. During trial, Ms. Martin indicated that Mother had never submitted to the required hair follicle drug test so that she might visit with the Child, despite Ms. Martin's encouragement and offer of transportation to the screening facility. Mother never provided proof that she had completed an approved domestic violence program or an alcohol and drug assessment. Ms. Martin informed the court that Mother had begun a domestic violence program "in the home" but that she had been dismissed from the program due to "lack of participation and noncompliance." Mother similarly failed to demonstrate that she had obtained suitable housing or a job, as required. Ms. Martin further explained that Mother had failed to appear for most of the juvenile court dates and had not kept in touch with DCS. On the contrary, Ms. Martin recounted that on some occasions she had not been able to contact Mother because Mother's phone "would not either be working, didn't have minutes or something or she would change phone numbers."

For the above-stated reasons, we determine that the evidence preponderates in favor of the trial court's conclusion that DCS had established this statutory ground for termination of Mother's parental rights by clear and convincing evidence.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Child

Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (West July 1, 2021, to current) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, DCS was required to show by clear and convincing evidence that (1) Mother had failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare. *See In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.") (citation omitted).

The trial court recounted in its findings of fact that (1) Mother had, aside from appearing to request appointment of counsel, "failed to appear at any point" before the trial court, including trial, and had previously "failed to appear and defend at various stages" of the juvenile court proceedings; (2) Father had filed for custody of the Child "due to [M]other's drug use and having the [C]hild out in the car late at night"; (3) Ms. Martin had testified to Mother's "issues with drugs, parenting, stability, housing, jobs, etc."; (4)

11

Mother had failed to submit to any required drug tests throughout the proceedings; and (5) Mother had not paid child support since November 2022. The trial court then concluded:

> The mother has done nothing to evidence assumption of physical or financial custody or an intent to do so. Further, placing the child in the legal or financial custody of the mother would pose a risk of substantial physical and/or psychological harm to the child in that the mother has essentially no relationship or bond with the child.

Our review of the record demonstrates that in June 2016, when the Child was three months old, he was removed from Mother's custody predicated on allegations of Mother's use and production of methamphetamine and flight from authorities with the Child. Since that time, Mother has never regained custody of the Child. In a report filed by DCS representative Stephanie Scalesi at the time of removal, Ms. Scalesi related that Mother was in the process of being evicted from her residence and had a "long history" of drug use. Ms. Scalesi had received reports that Mother was neglecting to properly feed or care for the infant Child due to her use of methamphetamines. Ms. Scalesi further stated that Mother "was willing to give up her rights to the [C]hild in order to avoid going back and forth in court" and that Mother had "refused" to take the necessary hair follicle drug testing to regain custody of the Child. The record includes two orders from the juvenile court— entered in June and December 2020 respectively—instructing that Mother was to have no contact with the Child until she submitted to a drug test. However, Mother never submitted to the required drug test despite proof that DCS workers offered her financial and transportation assistance to do so.

Mother did show some effort to provide financial support for the Child. The record demonstrates that after the Child was removed from her custody, Mother paid a total of $2,320.60 in child support between October 2020 and November 2022. However, after November 17, 2022, Mother did not make any further payments of financial support for the Child. Mother failed to appear at the termination trial, and she explained her reason for not appearing to Ms. Martin via a text message, which read as follows:

> Hey, I'm not sure I'm going to be able to make it to court. I was trying to get these child support warrants taken care of, but it's not looking like I'm going to have them all paid by 1:00. They are $4,800 together. I'm still $300 short. I won't have until about 3:00 p.m.

From this text communication, it appears that Mother owed $4,800.00 in child support arrearages as of August 2023 and that Mother believed there to be an outstanding attachment for her arrest relative to the unpaid child support. On appeal, Mother acknowledges that she owed this amount in child support and argues that she had "payment in hand" and intended to pay "at least $4,500.00" on the day of trial but did not do so for fear of being arrested. Mother laments that her failure to appear, due to fear of being

12

incarcerated on a child support attachment, left her "without the ability to present a defense or rebut any allegations, proof, or testimony presented" at the termination trial.

Upon thorough review, we determine that the evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Mother failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child. The Child was removed from Mother's custody in 2016 when he was an infant. Thus, at the time of trial in 2023, Mother had not exercised custody of the Child for approximately seven years—a period that encompassed almost the Child's entire life. During this time, Mother demonstrated no progress toward regaining custody of the Child through completing the requirements of the permanency plans or otherwise enabling herself to provide adequate care for the Child. Mother did not complete the required drug screening to be permitted to visit the Child, did not pay child support for the nine months preceding trial, and did not take any steps toward forging a parent-child relationship. We agree with the trial court that DCS sufficiently proved the first prong of this statutory ground.

DCS was also required to prove that returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare. *See In re Neveah M.*, 614 S.W.3d at 674, 677. Regarding this second prong of the statutory ground, this Court has previously observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

During trial, Ms. Martin indicated that the Child had been residing with the same foster parents since August 2020 and that he had been "doing really well" in his foster home and had maintained a "good relationship" with his foster siblings and foster parents. Ms. Martin, who for the past three years had visited with the Child regularly at his foster family's residence, remarked that the Child "need[ed] that structure" provided by the foster parents and that the environment in the foster home had served to improve the Child's "behaviors and his hyperactivity." Ms. Martin informed the trial court that the Child had come to "rely" on his foster parents and that they had expressed a willingness to adopt the Child.

13

In the termination order, the trial court found that the Child's "chances of early integration into a safe, stable and permanent home" would be "greatly reduced" if the Child were removed from the foster home where he had been "thriving." Regarding Mother specifically, the trial court determined that placing the Child in Mother's legal or physical custody would pose a risk of substantial physical or psychological harm to the Child because Mother had engendered "essentially no relationship or bond" with the Child. This Court has recently found that a risk of substantial harm to a child existed after reviewing proof of the parent's demonstrated "lack of involvement" in the child's life together with proof that the parent had failed to address her "substance abuse or environmental neglect issues" that resulted in removal. *See In re Ember H.*, No. E2023-00687-COA-R3-PT, 2024 WL 829765, at *4 (Tenn. Ct. App. Feb. 28, 2024). We reiterate that Mother has had no involvement with the Child since 2016 and has failed to provide proof that she has addressed her substance abuse problem. Moreover, this Court has previously acknowledged that removing children from foster families with whom they have bonded over time would "pose a risk of substantial harm to the physical or psychological welfare of the [child]." *See In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *12 (Tenn. Ct. App. Apr. 11, 2016) (quoting *State v. C.H.H.*, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *8-9, (Tenn. Ct. App. May 21, 2002)). This is especially so in a situation, such as here, where the Child has no relationship with the Mother. Accordingly, we conclude that the evidence preponderates in favor of the trial court's finding, by clear and convincing evidence, that Mother had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.

## B. Statutory Grounds for Termination of Father's Parental Rights

The trial court determined that clear and convincing evidence supported two of the three grounds asserted by DCS for termination of Father's parental rights: (1) substantial noncompliance with the permanency plans and (2) persistence of the conditions that led to removal of the Child into protective custody.

### 1. Substantial Noncompliance With Permanency Plans

The initial permanency plan created in August 2020 delineated Father's responsibilities as follows: (1) complete an approved domestic violence program or counseling; (2) follow all local, federal, and state laws and not incur any additional criminal charges; (3) obtain and maintain verifiable employment and provide proof of income; (4) consent to a walk-through and home visits by DCS at the parent's residence; (5) obtain and maintain safe, stable, and appropriate housing and provide DCS with a copy of the lease agreement and history of housing; (6) submit to random drug screens at DCS's request and submit to an alcohol and drug assessment in the event of a positive drug screen; (7) abide by all court orders including the permanency plan; (8) remain in contact with DCS and notify the social worker of any changes in circumstances or contact information; (9)

14

participate consistently in visitation with the Child while the child is in DCS custody and follow visitation rules. In August 2022, the permanency plan was updated to add the following requirements of Father: (10) refrain from associating with any known drug users or drug dealers and refrain from subjecting the Child to anyone who is under the influence; (11) submit to a "nail bed screen" as ordered; (12) arrange for anyone living in the same home with Father to submit to a background check; (13) provide proof of utilities "in his name" that have been connected for six months or more; and (14) continue to work to dispose of his criminal charges.

In determining that DCS had met the proof requirements for this ground, the trial court concluded:

> Certainly, the father has made much more effort than the mother to comply with the [permanency] plan. As is detailed above in the recitation of the proof, the father has partially complied with the Permanency Plan; but this court cannot find that his efforts constitute substantial compliance. Without recapitulating all of the above proof and findings, the court notes that the father complied with certain terms of the plan. Specifically, he obtained (recently) and maintained employment. He has also obtained and maintained suitable housing through his girlfriend for the past three-plus (3+) years. He has maintained contact with [DCS], at least while he has not been incarcerated. Plus, he has consistently participated in visitation and complied with the rules of [DCS] as to the visitation.
>
> However, there are several important requirements of the Permanency Plan that he has not complied with. First and foremost is that not only did he fail to submit to a drug screen/test for close to three (3) years after being ordered to do so by the [juvenile court], when he finally did so in April 2023, he failed the test due to the presence of both methamphetamine and oxycodone. These facts, coupled with his all-too-common to this court lame excuses for his failure of the screen/test, are of substantial significance to this court when determining significant compliance. The father was also arrested on several occasions after the Permanency Plan was put in place and failed to attend and complete an approved domestic violence program/course.
>
> The court would also note that the father's efforts to comply with the Permanency Plan have largely been in the calendar year 2023, after the filing of [the Termination Petition]. He had two (2) years to make progress prior to that and did not do so.

On appeal, Father contends that the trial court erred in finding that DCS had successfully proven this ground by clear and convincing evidence. Father begins his argument by attacking the trial court's focus on Father's delay in attempting to comply

15

with the permanency plans until after the Termination Petition was filed. Father cites to a recent decision of this Court in a parental termination case, *In re Allison S.*, for the proposition that a parent's improved efforts to substantially comply with a permanency plans, even if such efforts take place after a termination petition has been filed, should be "construed in favor of the parent." No. E2023-01072-COA-R3-PT, 2024 WL 2050502, at *13 (Tenn. Ct. App. May 8, 2024) (quoting *In re Jordan P.*, No. E2022-00449-COA-R3-PT, 2023 WL 2770680, at *10 (Tenn. Ct. App. Apr. 4, 2023)).

In *Allison S.*, the trial court had determined by clear and convincing evidence that the mother was in substantial noncompliance with the permanency plan. *See* 2024 WL 2050502, at *6. On appeal, this Court reversed the trial court's findings after determining that the mother had "made significant efforts in addressing her drug abuse and mental health issues[, had] completed most of the responsibilities related to these concerns[,]" and had also "secured employment" and completed parenting classes. *Id.* at *13. In reversing the trial court's decision relative to this ground, the *Allison S.* Court expounded:

> We note that many of the [permanency plan] responsibilities were completed by Mother after the petition was filed in November 2022. In some circumstances, we have held that a parent's efforts to complete permanency plan requirements after the petition for termination was filed were "too little, too late" to avoid this ground for termination. *See In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *7 (Tenn. Ct. App. Aug. 15, 2023); *In re Madux F.*, No. E2019-01535-COA-R3-PT, 2020 WL 1893646, at *14 (Tenn. Ct. App. Apr. 16, 2020) (quoting *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *10 (Tenn. Ct. App. Apr. 14, 2005)) ("This 'too little, too late' concept is often used to describe parents who, despite having an abundance of time and resources, wait until shortly before their termination hearing and then hurriedly try to comply with the obligations in their permanency plans."). "However, unlike the ground of abandonment, there is no indication in the statute defining substantial noncompliance that efforts made after the filing of the petition do not remedy prior inactivity." *In re Jordan P.*, No. E2022-00499-COA-R3-PT, 2023 WL 2770680, at *10 (Tenn. Ct. App. Apr. 4, 2023) (citing Tenn. Code Ann. § 36-1-113(g)(2)). Additionally, for this ground, "[i]mprovements in compliance are construed in favor of the parent." *Id.* (citing *In re Abbigail C.*, [No. E2015-00964-COA-R3-PT,] 2015 WL 6164956, at *20 [(Tenn. Ct. App. Oct. 21, 2015)]).

*Id.*

Although we agree in principle that Father's positive efforts to comply with the requirements of the permanency plans should not necessarily be discounted simply because they were undertaken after the Termination Petition was filed, we note a significant

distinction between the mother's efforts in *Allison S.* to address her drug problems and Father's efforts in this action. In *Allison S.*, the mother had completed many of her permanency plan responsibilities that related specifically to her drug use. *See id.* at *11. She had completed multiple alcohol and drug assessments, participated in drug screens "throughout the case," entered inpatient treatment, participated in therapy, and had not had "any relapse or positive drug screens" since completing inpatient treatment. *Id*. She had also testified at trial that there were no drugs in her home, a fact that DCS had neither disproven nor disputed. *Id*. After considering all of these facts, this Court determined that the mother had "made efforts to meet most of the requirements" concerning her drug use by the time of trial. *Id.*

By contrast, here, Father failed to comply with any of the requirements related to his drug use, except for the one drug screen he undertook in April 2023, which returned positive for illicit drugs. Father had been ordered by the juvenile court to submit to a drug test in July 2020, and the requirement remained in place for the three years that the Child had remained in DCS custody. The initial permanency plan required Father to submit to random drug screens, and the amended permanency plan in August 2022 required Father to submit to a "nail bed" drug screen. Father never complied with these requirements until April 2023. When questioned concerning his failure to submit to a drug test, Father responded that he was "not sure" when he had been ordered to take the drug test by the juvenile court because he "was in and out of jail." However, Father admitted during trial that he had participated in child and family team meetings through the juvenile court process and that he was aware of the permanency plan requirements.

Moreover, Ms. Martin explained that she had provided Father with an opportunity to take a drug test "just about every month" since Father was ordered to submit one and that she had reminded Father of the requirement through text messages. Ms. Martin added that Father would sometimes respond to these texts by telling her that he "was on his way" to get the drug screen but that he never provided proof that he had followed through with submitting to a drug test. Furthermore, the proof demonstrated that Father was out of jail for significant stretches of time during which he could have submitted to a drug test. Father finally submitted to a "nail bed" drug screen in April 2023, and the test returned positive results for both methamphetamines and oxycodone. When questioned about these positive results, Father maintained that he did not have a drug problem. He claimed that the positive oxycodone result stemmed from a recent hospital visit and prescription he had received from a doctor there. However, there is nothing in the record supporting Father's averment that he was prescribed oxycodone lawfully. Father did not offer an explanation for the positive methamphetamine result.

Additionally, Father did not comply with other permanency plan requirements relative to his drug use. These included the requirements to provide DCS with background checks on anyone residing with Father and complete an alcohol and drug assessment. Although Father claimed ignorance of the positive drug screen when questioned at trial,

17

the trial court determined that Father's testimony on this point was not credible. After considering the facts, the trial court determined that Father's substance abuse remained a significant barrier to reunification. Regarding Father's positive drug test result in April 2023, the trial court found:

> [T]he fact that when [Father] finally took the drug test, he failed due to the presence of methamphetamine and oxycodone tells this court that while he may have an earnest desire to be reunited with his son, he is unwilling or unable to leave his drug use behind.

(Citation to record omitted.) Regarding Father's credibility relative to his drug use, the trial court continued:

> Interestingly, the father denied that he had a history of substance abuse and also denied that he failed a drug screen. He also denied that the results of the drug screen were sent to him by [DCS]. When questioned as to the drug screen being positive for methamphetamine, he denied using methamphetamine as well as using any other drugs. Yet, when questioned as to the positive result on the drug screen for oxycodone, he testified that he was given that at "the hospital" for kidney problems. On cross examination, he continued to deflect any and all responsibility for testing positive on the drug test. He attempted to blame the oxycodone result on a prescription from an unnamed emergency room physician, but yet he provided no evidence in that regard. As to the positive test for methamphetamine, he once again testified that the test was in error. As referenced above when the court was discussing this witness['s] credibility, this court simply does not accept his explanation for the presence of both methamphetamine and oxycodone on his drug screen results dated April 28, 2023.
>
> The father testified that he is not sure when he was ordered to take the test by [the juvenile court]. The Order is clear and was signed on June 24, 2021. The Order sets out that he was not allowed visitation with his son until he took and passed the drug screen. This court finds that he chose not taking the drug screen over spending time with his son.

(Citations to the record omitted.) We reiterate that a trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones*, 92 S.W.3d at 838. Upon review, we find no evidence sufficient to disturb the trial court's conclusions with respect to Father's credibility. In sum, Father's failure to submit to a court-ordered drug screen for nearly three years, his test result showing positive for methamphetamine and oxycodone in April 2023, and his refusal to take responsibility for his prior drug use or his positive drug test result stand in stark contrast to the mother's efforts to meet her permanency plan

18

requirements in *Allison S.*  *See Allison S.*, 2024 WL 2050502, at \*11.  We therefore find Father's reliance on *Allison S.* in seeking reversal as to this ground unpersuasive.

Regarding the other requirements of the permanency plans, Father concedes on appeal that he did not complete every requirement but contends that he did make "great strides in completing what was asked of him."  We note that the trial court recognized Father's efforts to comply with the permanency plans and credited to Father his "palpable and sincere" desire to "be with his son."  For example, concerning the requirements that Father complete anger management and parenting classes, the trial court acknowledged that Father had done so "while in jail."  Likewise, the trial court noted that Father had obtained and maintained stable housing and had acquired "an automobile and a job" by the time of trial.  The trial court also acknowledged that Father had maintained contact with DCS and had consistently participated in visitation with the Child.

Despite Father's aforementioned efforts, the trial court placed great weight on Father's failure to comply with court-ordered drug testing and the fact that he tested positive for drugs in April 2023.  Moreover, Father was noncompliant in other significant areas as well.  Father failed to meet the requirement that he comply with local, federal, and state laws and refrain from incurring additional criminal charges.  After the initial permanency plan was created, Father was convicted of assault, was arrested for theft of property and pled guilty to joyriding, violated the terms of his probation, and was arrested twice for failing to pay child support.  Moreover, Father's positive results for two illegal substances add to the list of Father's actions failing to comply with local, federal, and state laws.  Regarding the requirement to abide by all court orders, we have previously discussed at length Father's failure to comply, for nearly three years, with multiple court orders instructing him to submit to a drug screen.  Respecting the requirement that Father allow DCS to visit his home and conduct in-home inspections, no such visit ever occurred.  Ms. Martin explained that Father had never initiated an in-home visit and that she had been unable to verify Father's address.  Finally, Father never provided a formal lease agreement regarding his residence and never provided a utility bill "in his name," as required by the permanency plans.  During trial, G.K. testified that she owned the home she shared with Father and that the utility bills for the residence remained in G.K.'s mother's name.

The trial court determined the requirement that Father complete a domestic violence program to be an "important" requirement in its final order.  Father admits that he never completed a domestic violence program but argues that his failure to do so "cannot serve as a basis for substantial non-compliance" with the permanency plans because the "need for a domestic violence class does not relate in any way" to the Child's removal from Father's care.  According to Father, his failure to complete a domestic violence course "would not be a barrier to family reunification."  In support, Father avers that the domestic violence charge that led to his incarceration in 2020 was based upon a false accusation made by Mother and had been subsequently dismissed.  DCS does not dispute that the domestic violence charge against Father was later dismissed, but there is no documentation

19

regarding the dismissal and no proof to support Father's assertion that the claims against him were false.

Despite Father's contentions that the requirement to complete a domestic violence program was not relevant to regaining custody of the Child, the record demonstrates that DCS remained convinced during the pendency of this action that Father's attendance in such a program was a necessary component for reunification. DCS included the requirement in the initial permanency plan, and the requirement was reiterated by a DCS case worker on September 8, 2020. The trial court ratified the permanency plan in October 2020 with the requirement intact. When the permanency plan was revised in August 2022 and again in February 2023, the requirement remained. Notably, Father was arrested and convicted of assault in 2021, demonstrating his continuing struggle with violence and anger issues. After careful review, we determine that the evidence supports the trial court's findings relative to this requirement. Based upon the totality of the evidence, we affirm the trial court's determination, by clear and convincing evidence, that Father failed to substantially comply with the requirements of the permanency plans.

## 2. Persistence of Conditions Leading to the Child's Removal

The trial court also determined that the statutory ground of persistence of the conditions leading to removal of the Child from Father's custody had been proven by clear and convincing evidence. The version of Tennessee Code Annotated § 36-1-113(g)(3) (West July 1, 2021, to June 30, 2022) in effect when the instant petition was filed provided the following additional ground for termination of parental rights:

(A)    The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

        (i)    The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

        (ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

The trial court summarized its findings regarding this statutory ground as follows:

> Here, the subject child has been removed from the home due to dependency and neglect for over three (3) years by an Order of the [juvenile court] dated June 2, 2020. It is clear to this court that the removal was due in large part to [Mother's] and [Father's] drug use. The fact that the father failed a drug screen/test for two (2) illicit drugs as recently as five (5) months prior to this trial and the fact that the April 2023 drug screen/test was the only test the father ever submitted to take is clear evidence to this court that the conditions still exist and that there is little likelihood that the father's drug use will be remedied "at an early date" in order to return the child. Finally, this court is convinced based upon the proof that the subject child's chances of early integration into a safe, stable and permanent home would be greatly reduced if returned to the father. The child is and has been in a stable home for the past three (3) years and is thriving.

Upon conducting a thorough review of the record, we determine that a preponderance of the evidence supports the trial court's findings, by clear and convincing evidence, that the conditions that led to the Child's removal from Father's custody persisted. By the time of trial, the Child had continued in protective custody for approximately thirty-eight months, far longer than the statutory six-month minimum. Although the trial court determined that the Child was removed from Father's custody due "in large part to the [Mother] and [Father's] drug use," we note that the record establishes that the Child was removed from Father's custody because he was arrested on domestic violence charges, charges that were later dismissed. However, the trial court determined that Father's continued drug use—proven by the positive drug test Father took in April 2023—remained a condition that would prevent the safe return of the Child to Father's custody at the time of trial. The trial court determined that Father's refusal to assume responsibility for his drug use and his failure to submit to court-ordered drug screening for three years indicated Father's continuing substance abuse problem. We agree. As discussed above, Father's denial of his drug use or even knowledge that he had been ordered to submit to drug screening compelled the trial court to conclude that Father's testimony overall was not credible and that there was "little likelihood" that Father's drug use would be remedied at an early date so that the Child could be safely returned to him.

21

On appeal, Father admits that his drug screen in April 2023 returned positive results but continues his evasion and refusal to take responsibility for his drug use. Father asserts that because the positive test results were "not provided to [Father] until the day of trial[,]" "it truly cannot be stated that [Father] did not remedy what the [trial court] perceived to be the issue (i.e., illicit drug use), as he was not aware of the positive drug screen and thus not afforded an opportunity to remedy the issue." In support of this argument, Father relies on his own testimony at trial to rebut the proof of his continued drug use and to argue that this was not a persistent condition. However, as noted above, the trial court determined that Father's testimony, particularly as it related to his own drug use, was not credible, and we will not disturb that determination. *See Jones*, 92 S.W.3d at 838. Beyond Father's testimony, the proof clearly demonstrates that during the pendency of this action, Father never returned a negative drug test, never completed an alcohol and drug assessment, and never admitted that he had a substance abuse problem.

The trial court determined that return to Father's custody would greatly diminish the Child's chances of early integration into a safe, stable, and permanent home. During trial, Ms. Martin expressed her concern, related to Father's positive drug test in April 2023, that if returned to Father's custody, the Child would be "exposed to [] safety concerns, who would be around, who would be in and out of the home." Although Ms. Martin had observed that Father and the Child had a bonded relationship and that the Child would express disappointment when his visits with Ms. Martin did not include Father, she maintained that termination of Father's parental rights was in the Child's best interest, explaining:

> It's the stability. [The Child is] very stable where he's at. He knows when things are going to happen. I know he loves his dad, but most of the time he's—you know, once he knows the visit is over, he's ready to go back to the foster home. He's got a smile on his face and he's ready to go. He's—he gets a lot of attention where he's at as well. They do try to spend one-on-one time with him.

Additionally, Foster Mother testified during trial concerning the Child's improvements in behavior and mental health since coming to live with her and her family. Foster Mother related that when the Child had come to live with his foster family, he had been exhibiting problems with anger and troubling behaviors such as "cussing," "hitting his head," and inappropriate "touching" of other children. Foster Mother then explained that the Child's behavior had improved significantly during the years he had lived with his foster family. She stated that the Child had engaged in regular "play therapy" at her urging, that he was "doing great" in school, that he was taking medication for attention deficit and hyperactive disorder ("ADHD"), and that he had integrated with their family, which included Foster Mother, her husband, and five other children. Foster Mother expressed a desire and willingness to adopt the Child should that become an option.

22

By contrast, little was known about Father's home environment beyond G.K.'s testimony that she and Father shared a "three bedroom, two bath dwelling" with her two minor children and her brother and that G.K. had inherited the home from her mother. Ms. Martin had never been in the home to conduct a home visit or assessment. To be sure, Father had lived with G.K. for over three years at the time of trial such that his housing location had become stable for some time. However, G.K. admitted that she had a criminal history of her own, having been convicted of a drug offense "four years ago." G.K. explained that as part of a "plea deal" related to her use of methamphetamine, she had been "in drug court" for "eight months" and remained subject to regular drug screens and testing as part of that program. G.K. also testified that she had witnessed Father's taking methamphetamine when they had "first met, but that was years ago."

In the final order, the trial court considered G.K.'s testimony regarding the home she shared with Father and its potential suitability for the Child. Specifically, the trial court included that G.K. had resided in the home with Father for "most of the last 3 years," that they shared the home with G.K.'s two children and G.K.'s brother, that the Child would "have his own bedroom" were he to come reside with Father and G.K., and that G.K. and Father both had a criminal history related to drug use. In addition, G.K. had attended some of Father's supervised visits with the Child, but the Child had never met G.K.'s two children, and G.K. and Father both had jobs and a "vehicle for transportation." The trial court then weighed the proof concerning the conditions of Father's home against the environment of the foster home and concluded that the Child's chances of integration into a safe and stable home would be greatly reduced if he were removed from the foster home and placed in Father's custody. Upon careful review, we determine that the evidence does not preponderate against the trial court's conclusion that clear and convincing evidence supported the statutory ground of persistent conditions as it relates to Father's parental rights.

## V. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case.").

Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2021, to current) lists the following factors for consideration:

(A)   The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)   The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)   Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)   Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)   Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)   Whether the child is fearful of living in the parent's home;

(G)   Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)   Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)   Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)   Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial

24

for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

25

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome

determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Here, the trial court conducted a detailed analysis of the best interest factors as they related to both parents and concluded that termination of both Mother's and Father's parental rights was in the Child's best interest. The trial court began its analysis of the best interest factors by noting that Mother "did not answer, appear for trial, or defend." Accordingly, the trial court found that "all relevant and pled best interest factors have been proven by DCS" as they related to Mother. The trial court also included a general statement that the Child's "residential, education, social, medical, and other needs are clearly being met by the foster parents." The trial court then addressed each of the best interest factors and concluded that termination of Mother's and Father's parental rights was in the Child's best interest. We will review each factor in turn.

The trial court found that factors (A), (B), and (C) weighed in favor of termination of both Mother's and Father's parental rights, noting that the proof had established that "both are illicit drug users who apparently had a volatile relationship that resulted in the [F]ather's arrest and incarceration." The trial court determined that the Child "did not have stable placement with [Father] or [Mother]" but had "enjoyed a stable and healthy home life" with his foster family, one that had "addressed the issues [the Child] came into custody with, i.e. head banging, [cussing], inappropriate touching etc." The trial court noted Father's repeated incarcerations and acknowledged that despite Father's "significant progress over the course of the last year," the court was not confident "or even marginally optimistic" that placement with Father would satisfy the Child's "critical need for stability and continuity."

Upon review, we agree. As detailed above, Mother has never provided the semblance of a stable environment for the Child (factor (A)), did not demonstrate continuity or stability in meeting the Child's basic material, educational, housing, or safety needs (factor (B)), and demonstrated no attachment with the Child (factor (C)). Mother refused to comply with drug testing, which was the one requirement she needed to satisfy so that she might enjoy visits with the Child. Thus, factors (A), (B), and (C) weigh in favor of terminating Mother's parental rights.

Turning to these factors as they relate to Father, we recognize that Father attempted to provide a stable environment for the Child by securing a stable housing location, employment, and transportation. However, the evidence was clear that Father continued his illegal drug use and serial incarceration until only a few months before the trial, which, in our estimation, greatly diminished Father's ability to provide the Child with a safe and stable environment. By contrast, the proof showed that the foster home where the Child

had been living for three years was a safe and stable home, wherein the Child's troubling behavioral problems had been addressed by the foster parents and the Child had attended regular therapy and taken medication for his ADHD. Accordingly, factors (A) (the effect a termination of parental rights will have on the Child's critical need for stability and continuity of placement) and (B) (the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition) weigh in favor of termination of Father's parental rights. For the same reasons, factor (C) weighs in favor of termination as well. Although Father had made progress toward stability for himself by maintaining the same residence for three years and securing transportation and employment in the months leading to trial, Father had not proven that he had conquered his drug problem and had continued his pattern of criminal activity throughout the proceedings. Thus, we agree with the trial court that there was "no apparent continuity and stability" in Father's life respecting factor (C).

Concerning factor (D), the trial court observed that Mother had "no known attachment" to the Child, and we agree. Mother lost custody of the Child when he was an infant due to her drug use and had not visited with the Child since his removal in 2016. This factor accordingly weighs in favor of termination of Mother's parental rights. The trial court also found this factor weighed in favor of termination of Father's parental rights. The trial court found that Father and Child enjoyed a "significant attachment" but then determined that such attachment did not equate to a "healthy" and "secure" bond without proof that Father's "illicit drug use had stopped." As stated above in detail, we agree that there was no proof that Father had stopped his drug use; indeed the proof indicated the opposite. We therefore conclude that factor (D) weighs in favor of termination of Father's parental rights.

Respecting factor (E), the trial court determined that Mother had "not made any effort, let alone a good-faith effort, to maintain visitation or regular contact with the [C]hild." As discussed in detail above, the evidence preponderates in favor of the trial court's determination that Mother did not maintain visitation or contact with the Child and that Mother did not cultivate any relationship—positive or otherwise—with the Child. This factor weighs in favor of termination of Mother's parental rights. The trial court did not weigh this factor in favor of termination of Father's parental rights, however, because Father had made a good faith effort to maintain visitation and contact with the Child. The proof established that Father had maintained visits with the Child whenever he was able and that he and the Child had developed a significant bond. Accordingly, this factor weighs against termination of Father's parental rights.

The trial court determined that there was no proof presented with regard to factors (F) and (G), concerning whether the child is fearful of living in the home with the parent, or whether being in the parent's home triggers or exacerbates the child's trauma. The trial court accordingly did not expressly weigh these factors for or against termination of Mother's or Father's parental rights. We agree with the trial court that nothing in the record

28

supports a finding in favor of termination relative to these two factors; therefore, we determine that they weigh against termination. *See In re Cartier H*., No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *14 (Tenn. Ct. App. Oct. 31, 2023) (determining that a factor in the best interest analysis that is "not proven to weigh in favor of termination . . . weighs against termination.").

Regarding factor (H)—whether the child has created a healthy parental attachment with another person or persons in the absence of the parent—the trial court found that it was "clear" that the Child had established such attachment with his foster parents, but the court did not expressly weigh this factor in favor of or against termination for either parent. Upon review, we determine that the Child had created a healthy parental attachment with his foster parents. The Child had lived with the foster parents for three years and had demonstrated healthy improvement in several behavioral areas. Ms. Martin explained that she had observed during home visits that although the Child was often "somber" if he knew he was not going to see Father during that particular visit, his relationship with his foster parents was such that he was generally "ready to go back to the foster home" with "a smile on his face," even after a good visit with Father. Ms. Martin noted that throughout her monthly home visits, the foster parents gave the Child "a lot of attention" and tried to "spend one-on-one time" with him. Foster Mother informed the court that the Child called her "mom" and viewed Foster Mother and her husband as "mom and dad." Foster Mother also expressed a desire to adopt the Child. Considering the evidence, we determine that this factor weighs in favor of termination of Mother's parental rights because she was entirely absent from the Child's life during his time in the foster home. Regarding this factor as it relates to Father, we note that while the Child enjoyed a healthy and close relationship with his foster parents, he also enjoyed a bonded relationship with Father, whom he was "crazy about," albeit in the limited context of supervised visitation. Accordingly, we determine this factor to be neutral as it relates to Father's parental rights.

The trial court found the evidence to be "rather scant" relative to factor (I), which concerns whether the child has an emotionally significant relationship with persons other than the parents or caregivers, including biological or foster siblings, and the likely impact of available outcomes on those relationships and the child's access to information about his or her heritage. The trial court referenced Foster Mother's testimony about "some aspects" of the relationship between the Child and his foster siblings. The trial court concluded that the "scantiness of the proof" did not permit the court to make a clear and convincing finding concerning this factor as to either parent.

However, upon review, we find that the proof was more compelling than indicated by the trial court that the Child had formed familial bonds with his foster siblings. Specifically, Foster Mother informed the court that the Child viewed his foster siblings as his own siblings, calling them "sister" and "brother." The Child also referred to himself as "uncle" to Foster Mother's grandchild. Foster Mother observed that the Child and the other foster siblings behaved like normal siblings, who "play and then they fuss and then they

29

come back together." By contrast, there was a dearth of evidence regarding any familial heritage respecting either Mother's or Father's side of the family. There was no proof related to Mother's family. As to Father's family, the evidence demonstrated that Father had other children and grandchildren but none of them were residing with Father. Moreover, there was no evidence that the Child had ever met any of them. Likewise, although G.K. had two children of her own living with her in the home she shared with Father, G.K. testified that the Child had never met her children. Having considered the proof, we find that clear and convincing evidence supports a determination that the Child had formed significant bonds with his foster siblings such that removal from the foster home would have a negative impact on the Child. By contrast to these bonds with his foster siblings, there was no proof to show any similarly significant relationships between the Child and any other family members. Accordingly, this factor weighs in favor of termination of both Mother's and Father's parental rights.

Regarding factor (J)—whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including whether there is criminal activity in the home or by the parent, or the use of alcohol or controlled substances which may render the parent unable to consistently care for the child in a safe and stable manner—the trial court determined that this factor weighed in favor of termination of both Mother's and Father's parental rights to the Child. Clearly, the evidence preponderates in favor of this finding as it relates to Mother. Mother lost custody of the Child when he was an infant due to her drug use, and there is no proof that she ever attempted to remedy the situation.

Concerning Father, we agree with the trial court that "this factor [(J)] is more complicated." However, having determined that the conditions that led to the Child's removal from Father's custody persisted, we further determine that this factor weighs in favor of termination of Father's parental rights. Father's illicit drug use, his refusal to take responsibility for his drug use, his repeated and continuing criminal activity, and the fact that the Child had not lived with him for over three years by the time of trial present clear and convincing evidence that Father had not yet demonstrated a lasting adjustment of circumstances that would make it safe or beneficial for the Child to reside in Father's home.

Factors (K) and (L) relate to whether a parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions and whether DCS has made reasonable efforts to assist the parent in making a lasting adjustment when the child is in DCS custody. The trial court determined that "neither parent has taken advantage of available programs, services, [or] community resources."

As to Mother, the trial court determined that she had made no effort in this regard despite DCS's reasonable efforts to assist her. We agree. As stated above, Mother never availed herself of any of the programs offered to her. The proof was that DCS had placed

30

a domestic violence program in Mother's home but that the program was discontinued due to Mother's noncompliance. In addition, Mother did not ever submit to a drug test to regain her visitation rights with the Child, despite multiple court orders and a permanency plan requiring same. The record demonstrates that Ms. Martin attempted to assist Mother in this regard. Furthermore, Mother failed to complete an alcohol and drug assessment and did not attend parenting classes.

As factors (K) and (L) pertain to Father, the proof evinced that he did complete some programs, such as online parenting and anger management classes. However, according to Ms. Martin's testimony and the amended permanency plan, DCS required Father to take an in-person parenting class and a domestic violence class, both of which he failed to do. As detailed above, Father did not submit to a drug test until April 2023 and never completed an alcohol and drug assessment as required by the permanency plan. Moreover, Ms. Martin testified that she had assisted Father in starting two domestic violence programs in his home, but that Father had been "dismissed out of both programs" due to noncompliance. Regarding DCS's efforts to reunite the Child with the parents, the trial court consistently found in its review orders that DCS had made reasonable efforts to reunify the family and prevent the Child from continuing in foster care unnecessarily. Having thoroughly reviewed the record as it pertains to factors (K) and (L), we find that the evidence preponderates in favor of the trial court's finding that these grounds weigh in favor of termination of both Mother's and Father's parental rights.

The trial court determined that factor (M)—a parent's demonstrated sense of urgency in addressing the circumstances, conduct, or conditions that would make an award of custody unsafe and not in a child's best interest—weighed in favor of terminating Mother's parental rights. We agree. Mother never visited with the Child, never completed any of the permanency plan requirements, rarely appeared before the juvenile court, and did not personally appear during trial. Regarding Father, the trial court found that DCS's proof concerning this factor did not rise "to the level of clear and convincing"; thus, the trial court declined to weigh this factor either for or against termination of Father's parental rights. The trial court did, however, note that Father had demonstrated a sense of urgency, "albeit somewhat belatedly." Upon review, we agree that Father presented some urgency in addressing his circumstances to better his situation for the Child's sake, such as securing a home, acquiring and maintaining employment, establishing a mode of transportation, and keeping up with his supervised visits with the Child when he was able. However, the fact that Father tested positive for illegal drugs only five months before trial and refused, when questioned, to acknowledge any substance abuse or to take responsibility for his failure to submit to drug screens for three years, negates the sense of urgency Father showed in other areas. While Father's attempts to rectify his situation are commendable, they do not mitigate the seriousness of Father's continued drug use and its potential effect on the best interest of the Child. Therefore, this factor weighs in favor of termination of Father's parental rights.

The trial court determined that there was no proof concerning factor (N)—whether the parent or other person residing with or frequenting the home of the parent has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any child or adult. Upon review, we agree. Accordingly, this factor weighs against termination of Mother's and Father's parental rights. *See In re Cartier H.*, 2023 WL 7158076, at *14.

As to factors (O)—whether the parent has ever provided safe and stable care for the child or any other child—and (P)—whether the parent has demonstrated an understanding of the basic and specific needs required for the child to survive—the trial court determined that there was no proof introduced at trial concerning either factor and did not expressly weigh these factors in favor of or against termination of the parental rights of either parent. Indeed, we agree that nothing in the record demonstrates that Mother had ever provided safe or stable care for the Child or any other child. However, the record does demonstrate that Mother had several encounters with DCS in the past and had previously lost custody of five other children due to her drug use and criminal activity. In the instant case, Mother had demonstrated no understanding of the basic and specific needs of the Child, having lost custody of the Child when he was an infant. Accordingly, we determine that both factors (O) and (P) weigh in favor of terminating Mother's parental rights.

Regarding factor (O) as it pertains to Father, there was evidence that Father had raised other children who were adults at the time the instant action was commenced, but no specific evidence was presented regarding whether he had provided safe and/or stable care for them. Father had also maintained custody of the Child for nearly four years without incident or DCS intervention before he was arrested and the Child taken into protective custody. According to the testimony of G.K., Father was residing with G.K.'s two minor children at the time of trial, and there was no proof that DCS had been involved or that there existed trouble concerning those children. However, there was also no proof concerning the condition of the home Father shared with G.K. or whether the home environment was safe and/or stable for those children. Weighing and balancing this evidence, we determine that factor (O) is neutral concerning Father.

Concerning factor (P) as it pertains to Father, we determine that this factor weighs in favor of termination of Father's parental rights. Although Father maintained a bond with the Child in the context of supervised visits and provided specific gifts for the Child and obvious affection, Father had not taken critical steps, such as addressing his criminal behavior and drug use, necessary to provide the type of stable environment that would facilitate the Child's ability to thrive. Father's unwillingness to address or acknowledge his continuing drug problem demonstrated a fundamental lack of understanding of the basic needs of any child for a secure and stable home and an inability or unwillingness to create in his own home and life the stability necessary to care for the Child's basic and specific needs or to help the Child thrive.

Similarly, factor (Q)—whether a parent has demonstrated an ability and commitment to creating and maintaining a home that meets the child's basic needs—weighs in favor of termination of Father's parental rights. Father had never allowed DCS into the home he shared with G.K., nor had Father initiated a home visit. Ms. Martin explained that typically a parent who is seeking custody of his or her child will show that "the home is in the parent's name . . . utilities are in their name and they're on consistently for a period of time." In the alternative, if the parent lives in a home owned by a third party, the parent would typically show that the parent is "on the lease with the person and the other person has to have a background check done." According to Ms. Martin, Father failed to demonstrate that any of these had been accomplished.

Testimony during trial was contradictory concerning the living arrangement and agreements between Father and G.K. regarding the residence they shared. Ms. Martin recounted that she had received a "lease agreement" from G.K. on June 1, 2021, but Ms. Martin stated that the document did not contain any terms typical of a lease agreement, such as a length of time or rental payment amount. G.K. explained that this lease agreement was "base to base, not like a time period lease." Father, however, stated that there was no lease at all. The testimony was also inconclusive regarding who paid the bills for the home. According to Father, he paid the "light bill and water bill." According to G.K., the utility bills for the home remained in her mother's name, and G.K. paid those bills. G.K. did state that she and Father paid for everything "half and half," but there were no documents linking Father's name with the residence and no proof that Father maintained any enforceable right to remain in the home. Moreover, no background checks had been conducted concerning anyone residing in the home with Father, as required by the permanency plan. Factor (Q) weighs in favor of termination of Father's parental rights. Because Mother did not appear at trial, she also failed to demonstrate an ability or commitment in creating and maintaining a home that would meet the Child's basic needs or where the Child could thrive, and therefore factor (Q) also weighs in favor of terminating Mother's parental rights.

The trial court determined that there was no proof presented concerning factor (R)—whether the physical environment of a parent's home is safe and healthy for the child. However, for the same reasons that we find factors (P) and (Q) weigh in favor of termination of parental rights as to both parents, we find that factor (R) also weighs in favor of termination of both Mother's and Father's parental rights.

Factor (S) concerns whether a parent has consistently provided more than token financial support for the Child. The trial court determined that DCS had proffered sufficient proof that Mother had failed to provide consistent support for the Child. Mother had paid child support intermittently during the pendency of the termination action but owed a support arrearage in the amount of $4,800.00 on the day of trial. In fact, Mother texted Father and Ms. Martin on the day of trial to explain that she was afraid to come to the courthouse for fear of being arrested on a child support attachment. This factor weighs in favor of terminating Mother's parental rights.

33

As factor (S) relates to Father, the trial court determined that DCS had failed to prove that Father was inconsistent with his child support payments. Upon review, we disagree. The evidence presented at trial was clear that Father was not consistent with his child support payments after losing custody of the Child in 2020. The proof showed that Father had been incarcerated twice for failure to pay child support, and Father clarified that "someone else" had paid his child support purge payment on one of those occasions. Father stated that he had been paying child support "ever since I've had a permanent job" and explained that the payments were "coming out [of his] check." However, on cross-examination, Father admitted that he had only been making regular voluntary child support payments via his paycheck since July of 2023, one month before the trial began. In fact, most of Father's child support payments had been made to purge his arrearage to be released from jail (with at least one of those purge payments having been covered by someone else). In addition, eight months before the trial began, Father was required to pay a purge payment of $600.00 in child support arrearage to reinstate his driver's license. Hence, although we commend Father for his efforts to obtain gainful employment and to finally begin paying child support, we find that his voluntary payment of one month of child support prior to trial is the very definition of "too little, too late" and is not sufficient to sway this factor in his favor. *See In re L.J.*, No. E2014-02042-COA-R3-PT, 2015 WL 5121111, at *7 (Tenn. Ct. App. Aug. 31, 2015) (holding that a mother's act in obtaining housing only "two weeks before the final trial date in the termination proceeding" was "too little, too late."); *see also In re Daymien T.*, 506 S.W.3d 461, 473 (Tenn. Ct. App. 2016) (concluding that the father's "progress on the requirements of the permanency plan after the filing of the termination petition" was "too little, too late" considering that the father had failed to take any action for nearly two years after the child had been removed from his custody) (internal citations omitted). Accordingly, factor (S) weighs in favor of terminating Father's parental rights to the Child.

The trial court concluded that no proof was introduced regarding factor (T)—whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child—and accordingly did not weigh this factor for or against termination of either Mother's or Father's parental rights to the Child. Upon review, we disagree with the trial court's conclusions pertaining to factor (T). Concerning Mother, the evidence was abundant that Mother's emotional fitness, or lack thereof, would be detrimental to the Child. She lost custody of the Child when he was an infant, and documents presented at trial demonstrate that Mother had lost custody of five other children to DCS due to her "long history of drug use." In our view, Mother's consistent drug use and repeated need for DCS intervention to care for her several children, including the Child, constitute clear and convincing evidence that Mother is emotionally unfit to care for or supervise the Child. As to Father, his history of drug use and his refusal to assume responsibility or even acknowledge that he ever had a drug problem also constitute clear

34

and convincing evidence that Father lacks the emotional stability to care for and supervise the Child.

Considering and weighing the entirety of the applicable factors, we conclude that the evidence weighs significantly in favor of terminating Mother's parental rights to the Child. We therefore affirm the trial court's ruling, by clear and convincing evidence, that termination of Mother's parental rights was in the Child's best interest. Concerning Father, more of the factors weighed against termination of his parental rights than Mother's. We note particularly that Father had attempted to gain stability in his residential situation and employment and, most importantly, had continued to visit with the Child with whom he enjoyed a strong bond. However, we cannot ignore Father's unwillingness to address his drug use, even when questioned during trial, and his repeated incarcerations that continued during most of the custodial period. Accordingly, we also affirm the trial court's ruling, by clear and convincing evidence, that termination of Father's parental rights was in the Child's best interests.

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's and Father's parental rights to the Child and for collection of costs assessed below. Costs on appeal are assessed one-half to the appellant, Jaclyn W., and one-half to the appellant, Jeremy W.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE